**UNITED STATES**

v.

**Toro NMN KHAMSOUK, Ship's Serviceman Seaman Apprentice (E–2), U.S. Navy.**

**NMCM 99 00711.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 22 Aug. 1997.

Decided 25 Jan. 2001.

---

LT Mari–Rae Sopper, JAGC, USNR, Appellate Defense Counsel.

Maj Edward C. Durant, USMC, Appellate Government Counsel.

Michael Bahar, Appellate Government Counsel under Supervision.

Before DORMAN, Senior Judge, LEO, Senior Judge, and NAUGLE, Appellate Military Judge.

DORMAN, Senior Judge:

On 22 August 1997, the appellant was convicted, contrary to his pleas at a general court-martial consisting of a military judge sitting alone, of fraudulent enlistment, five specifications of larceny, forgery, and 16 specifications of the unauthorized use of another's credit card. The appellant's offenses violated Articles 83, 121, 123, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 883, 921, 923, and 934. The approved

sentence includes confinement for five years, a fine of $2500, forfeiture of all pay and allowances, reduction to pay grade E–1, and a bad-conduct discharge. We have carefully reviewed the record of trial,[1] the appellant's two assignments of error, and the Government's response. We also have considered the excellent arguments of appellate counsel presented before us at the Naval Justice School, Newport, Rhode Island on 7 July 2000. We conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

The appellant raises two issues. First, he argues that the military judge abused his discretion when he denied the appellant's motion to suppress all evidence seized incident to the appellant's apprehension and his resulting admissions. The thrust of the appellant's argument is that his apprehension was illegal and thus all evidence seized is tainted by the illegal apprehension and, thus is inadmissible. Appellant's Brief of 28 Apr 2000 at 4–7. He next argues that he is entitled to relief because of an inordinate period of post-trial delay that adversely affected his opportunity to seek relief before the Naval Clemency and Parole Board. *Id.* at 7–8. To fully address these issues, an exposition of the facts is necessary.

### Facts

*Search and Seizure.* On 5 February 1997, Special Agent [SA] Edward Coyle of the Naval Criminal Investigative Service [NCIS] possessed a DD Form 553, declaring the appellant a deserter from the United States Navy. This DD Form was issued by the appellant's commanding officer. The reverse side of the form contained the following information:

Any civil officer having authority to apprehend offenders under the laws of the United States, or of a State, territory, commonwealth, possession, or the District of Columbia may summarily apprehend deserters from the Armed Forces of the United States and deliver them into custody of military officials. Receipt of this

---

1. The Government's Motion to Attach Documents, dated 3 July 2000 is granted.

form and a corresponding entry in the FBI's NCIC Wanted Person File, or oral notification from military officials or Federal law enforcement officials that the person has been declared a deserter and that his/her return to military control is desired, is authority for apprehension.

DD Form 553, Information, ¶ 1a. The first sentence of this language is contained in Article 8, UCMJ, 10 U.S.C. § 808. Armed with this document and information that the appellant was staying at the private, off-base residence of Hospitalman Second Class [HM2] Thomas Guest, U.S. Navy, SA Coyle and three other NCIS agents went to HM2 Guest's house to apprehend the appellant.

The agents decided to wait for appellant to leave the residence and apprehend him outside because SA Coyle believed they could not apprehend appellant inside the residence without an arrest warrant and a search warrant. At approximately 1315, two individuals exited HM2 Guest's house; one was an Asian male similar in appearance to the appellant. The agents stopped the two individuals, thinking they were going to apprehend the appellant. The agents soon found that the Asian male was not the appellant. The other individual was HM2 Guest. At that time, SA Coyle advised HM2 Guest that he had a warrant for appellant's arrest. HM2 Guest informed SA Coyle that the appellant was inside the residence. When SA Coyle asked whether NCIS could go in and apprehend the appellant, HM2 Guest replied that he "would prefer if they would wait and allow me to bring him out, that he would come out voluntarily if they would let me." Record at 133. HM2 Guest then walked toward the front door of the residence, which was already open, with SA Coyle following behind. HM2 Guest went inside the foyer of the residence and SA Coyle stopped at the door. With SA Coyle close enough to hear what was being said, HM2 Guest called for the appellant. What happened next is subject to some dispute.

As HM2 Guest entered his house he called for the appellant and walked a few feet into the foyer. The living room was to the left of the foyer and the entrance to the living room could be seen from the open front door.

HM2 Guest walked to a position near the entrance of the living room. SA Coyle testified that after HM2 Guest called for the appellant, "an Asian male ... stepped out of the room ... just to the left side of the front door. I asked him if he was Anthony Khamsouk. He stated he was. I informed him he was under military apprehension, stepped into the residence and took him into custody." Record at 115. SA Coyle also testified, however, that the apprehension took place in the foyer. *Id.* at 121, 124. He testified that at the time the appellant was taken into custody, he advised the appellant of his Article 31(b), UCMJ, 10 U.S.C. § 831(b), rights. He also testified that after the appellant was apprehended he executed a permissive authorization for search and seizure. Appellate Exhibit XXV. HM2 Guest also agreed to a permissive search of his house to secure the appellant's belongings. Appellate Exhibit XXIV. As a result of the searches, NCIS agents seized the appellant's knapsack and a duffel bag. These items were removed from the house and searched at the NCIS office.

Although HM2 Guest's testimony was substantially the same as that of SA Coyle regarding the search and seizure of the appellant's belongings, his recollection of how the appellant was apprehended differs. He testified that after he entered the house he walked to a position near the living room and called for the appellant, telling him that "he needed to come to the door because there was someone there who wanted to speak to him." Record at 133. He recalls that the appellant got off of the sofa in the living room and tried to peek around the corner to see who was there. He did not believe that SA Coyle would have been able to see the appellant at that point. *Id.* at 144. He then recalls that SA Coyle went past him and took the appellant into custody. *Id.* at 136. HM2 Guest does not recall SA Coyle saying anything to the appellant before he came into the house, nor does he recall SA Coyle advising the appellant of his Article 31(b), UCMJ, rights. *Id.* 144–45.

Following the appellant's apprehension, he was removed from HM2 Guest's house and taken to the NCIS office. Once at the NCIS office, a written acknowledgment of rights

was executed, and the appellant's belongings were searched. As a result of the search, numerous pieces of evidence were discovered that were used in prosecuting the appellant for larceny, forgery, and wrongfully using credit cards. Additionally, the appellant's statements to SA Coyle after the appellant had been advised of his rights at the NCIS office were also admitted against him at his court-martial.

*Post–Trial Processing.* The appellant's trial adjourned on 22 August 1997. The record of trial was prepared in less than a month, with a copy being provided to the trial defense counsel on 16 September 1997. Ten days later the trial counsel signed the record indicating he had examined it and had made all necessary corrections. The military judge, however, did not authenticate the record until 31 October 1998, and it was not served upon the appellant until 1 December 1998. The staff judge advocate signed his recommendation to the convening authority [CA] on 10 February 1999, and the CA took action in this case on 15 April 1999.

During the time that the appellant was confined pending action by the CA, an annual Brig Clemency and Parole Review Board was conducted on 30 June 1998, at the Charleston Brig where the appellant was confined. Since the CA had not acted on his case, the appellant was not eligible to be considered for clemency by that Board. Secretary of the Navy Instruction 5815.3H, section 401 (5 Oct 1993). On 27 April 1999, another Board was held at the Charleston Brig. Although the appellant waived review by this Board, he had not been informed that the CA had taken his action 12 days earlier. On 14 October 1999, the Charleston Brig Clemency and Parole Review Board considered the appellant's case, and he was recommended for parole on or after 1 April 2000. In making its recommendation, the Board placed certain conditions that needed to be met for parole. The Board noted that the appellant had outstanding civilian legal matters to resolve. It informed the appellant that the reason the Board recommended a parole date of on or after 1 April 2000 was "to allow him ample time to clear up his civilian offense record." Prisoner Assignment and Clemency Board

Action dated 25 Oct 1999. The appellant was released from confinement on parole on 15 May 2000.

## Discussion

*Search and Seizure.* In his first assignment of error, the appellant asserts that the military judge abused his discretion in denying the appellant's motion to suppress evidence seized during a search of his knapsack and duffel bag. He argues that they should have been suppressed as the fruits of an illegal apprehension. The appellant's argument is based upon his interpretation of RULE FOR COURTS-MARTIAL 302(e)(2), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.) In pertinent part that rule provides that:

> No person may enter a private dwelling for the purpose of making an apprehension ... unless:
>
> ....
>
> (ii) if the person to be apprehended is not a resident of the private dwelling, the apprehension is authorized by an arrest warrant and the entry is authorized by a search warrant, each issued by competent civilian authority.
>
> A person who is not a resident of the private dwelling entered may not challenge the legality of an apprehension of that person on the basis of failure to secure a warrant or authorization to enter that dwelling, or on the basis of the sufficiency of such a warrant or authorization.

*Id.* These provisions were added to the Manual in conformity with decisions of the United States Supreme Court in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), App. 21, at A21–14.

The appellant argues that since SA Coyle did not have an arrest warrant issued by a civilian authority, his apprehension was illegal. The appellant recognizes that the R.C.M. provision specifically prevents him from challenging the apprehension itself based on the failure of the NCIS agents to obtain a *search* warrant. Appellant's Brief of

28 Apr 2000 at 5 n. 1. The appellant, however, attacks the apprehension and the fruits of the apprehension because the agents did not have an *arrest* warrant issued by a competent civilian authority. We do not agree with the appellant's arguments and find that the military judge did not abuse his discretion by admitting the evidence.

■ We apply an abuse of discretion standard in reviewing a military judge's denial of a motion to suppress evidence. His findings of fact are reviewed under a clearly erroneous standard and his conclusions of law are reviewed de novo. *United States v. Monroe*, 52 M.J. 326, 330 (2000). Where the military judge's decision has been influenced by an erroneous view of the law an abuse of discretion is the likely result. *United States v. Vassar*, 52 M.J. 9, 12 (1999). In the case before us it is clear that the NCIS agents who apprehended the appellant did not comply with explicit provisions of the portions of R.C.M. 302(e)(2) quoted above. The military judge recognized that fact, but found that "[t]he DD Form 553, taken in conjunction with 10 U.S.C. § 808, is the functional equivalent of an arrest warrant, in that it provides ... a quasi-judicial determination of probable cause and the authority for civilian law enforcement officials to apprehend a service member for desertion." Appellate Exhibit XLI at ¶ 3.1.6. Having reviewed that legal conclusion *de novo*, we adopt it as our own.

We begin our analysis of this issue by examining the two Supreme Court cases upon which the provisions of R.C.M. 302(e)(2) are based. In *Payton*, 445 U.S. at 574, 100 S.Ct. 1371, the Court examined the constitutionality of a New York statute that authorized police officers to enter a private residence without a warrant, and with force if necessary, to make a routine felony arrest. The Court struck down the provision finding that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Id.* at 576, 100 S.Ct. 1371. The Court held that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* at 585, 100 S.Ct. 1371 (quoting *United States v. United*

States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). The Court went on to hold that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 603, 100 S.Ct. 1371.

In *Steagald*, 451 U.S. at 204, 101 S.Ct. 1642, the Court addressed the search and seizure of evidence from Steagald's residence where the officers conducting the search had a warrant for the arrest of a third party, and they believed they would find the third party in Steagald's residence. Although the real issue in the case addressed the suppression of evidence seized in Steagald's home, which was then used against him at trial, in dicta the Court also addressed the Fourth Amendment rights of an individual when in the residence of another. The Court noted that Fourth Amendment rights "are personal in nature, and cannot bestow vicarious protection on those who do not have a reasonable expectation of privacy in the place to be searched." *Id.* at 219, 101 S.Ct. 1642 (citing *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), and *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). Furthermore, the Court has clarified that the arrest warrant requirement of *Payton* was "imposed to protect the home." *New York v. Harris*, 495 U.S. 14, 20, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). *See also Minnesota v. Carter*, 525 U.S. 83, 100, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (Kennedy, J., concurring).

■ In the case before us, the NCIS agents who apprehended the appellant went to the home of HM2 Guest in possession of a DD Form 553 that declared the appellant to be a deserter from the U.S. Navy. They had a reasonable belief that they would find the appellant in HM2 Guest's home, and they patiently waited outside for the appellant to come out so that they could apprehend him outside the home. The DD Form 553 provided them with authorization to apprehend the appellant and was in accordance with Article 8, UCMJ. R.C.M. 302(e)(2), however, imposes an additional requirement that an arrest

warrant be obtained from a civilian authority before apprehending a servicemember in a private home. We concur with the military judge that when an individual is being apprehended for desertion, a properly executed DD Form 553[2] stands in the place of an arrest warrant. Such a properly executed form satisfies the constitutional concerns of *Payton.*

The purpose behind the warrant requirement is to allow a neutral judicial officer to assess whether the police have probable cause to make an arrest. *United States v. Hultgren,* 713 F.2d 79, 84 (5th Cir.1983). "[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton,* 445 U.S. at 603, 100 S.Ct. 1371. In this case, the appellant's Commanding Officer, Commander Daniel Holloway, U.S. Navy, personally investigated the facts concerning the appellant's absence in order to ensure that there were no innocent explanations to explain the absence. Appellate Exhibit XXII. He then executed the DD Form 553, authorizing appropriate law enforcement officials to summarily apprehend the appellant. *Id.* As such, SA Coyle was acting within his authority and consistent with the statutory language contained in Article 8, UCMJ, when he apprehended the appellant. Furthermore, in the military, a commanding officer "stands in the same position as a Federal magistrate issuing a search warrant." *United States v. Sam,* 46 C.M.R. 124, 127, 1973 WL 14462 (C.M.A.1973). Commanders are also equated to civilian magistrates in making probable cause determinations, *United States v. Lopez,* 35 M.J. 35, 38 (C.M.A.1992); and absent evidence to the contrary, a commander is considered neutral and detached. *See United States v. Ezell,* 6 M.J. 307 (C.M.A.1979).

We also note that for most offenses for which a military member could be apprehended in a private home, an arrest warrant would be required to comply with both *Payton* and R.C.M. 302(e)(2). The only offense for which the DD Form 553 applies is desertion, the offense for which the appellant was apprehended. Appellate Exhibit XXII. Thus, the observation of the military judge that requiring an arrest warrant issued by civilian authorities under the facts of this case "would be superfluous and contrary to the congressionally mandated scheme set out in [Article 8, UCMJ]," Appellate Exhibit XLI at ¶ 3.m, is accurate and does not reflect an erroneous view of the law.

■ Having applied the applicable standards of review to this case we find that the military judge did not abuse his discretion in denying the appellant's motion to suppress. The evidence of record supports the findings of fact and the decision was not influenced by an erroneous view of the law. Since we conclude, as did the military judge, that under the facts of this case, the DD Form 553 was the functional equivalent of an arrest warrant, the appellant's apprehension inside HM2 Guest's home was lawful. Accordingly, since the apprehension of the appellant was lawful, there is no taint upon the evidence seized in HM2 Guest's home, nor upon the appellant's subsequent admissions, and they were properly admitted into evidence.

*Post–Trial Processing.* In his second assignment of error the appellant asks that the charges and specifications against him be dismissed because of inordinate delay between the date of his court-martial and the date of the CA's action. In support of his argument the appellant relies upon *United States v. Clevidence,* 14 M.J. 17 (C.M.A. 1982)[3], and a summary disposition in *United*

---

**2.** The DD Form 553 is commonly referred to as a "military warrant." See e.g. *United States v. Province,* 45 M.J. 359, 364 (1996), Appendix, ¶ 3. Furthermore, this court routinely reviews cases in which an appellant has been convicted of desertion or unauthorized absence, and where the appellant has been apprehended in someone else's home based solely on a military warrant. We recognize that simply because this is common practice does not mean that the practice is legally correct.

**3.** Seaman Recruit [SR] Clevidence was confined post-trial for less than 90 days and then went on appellate leave. On appeal he argued that he had been prejudiced because several potential employers had been concerned that he might be recalled to active duty. While our superior court dismissed the charges against SR Clevidence, it noted that it would be more hesitant to do so if his crimes had been more serious. SR Clevidence was tried by special court-martial for

*States v. Gentry*, 14 M.J. 209 (C.M.A.1982)[4]. The appellant, however, also correctly notes that in order to merit relief it is necessary to test for prejudice. *United States v. Banks*, 7 M.J. 92, 94 (C.M.A.1979). We have done so and do not find that prejudice has been demonstrated in this case.

The Court of Appeals for the Armed Forces has repeatedly denounced unexplained delays in the post-trial processing of courts-martial. *United States v. Hudson*, 46 M.J. 226, 227 (1997); *United States v. Jenkins*, 38 M.J. 287, 288 (C.M.A.1993); *United States v. Shely*, 16 M.J. 431, 431 (C.M.A. 1983). However, delay alone is not sufficient to justify relief. *Hudson*, 46 M.J. at 227. As a matter of law, "applications for relief because of delay of final action by the Convening Authority will be tested for prejudice." *Banks*, 7 M.J. at 94. *See also Hudson*, 46 M.J. at 227 (holding that an 839 day delay between trial and the CA's action did not prejudice Hudson); and *Jenkins*, 38 M.J. at 288 (stating that "an appellant seeking such relief must demonstrate some real harm or legal prejudice flowing from that delay."). Relief will not be granted when the harm claimed was speculative, not supported by independent evidence, and the appellant has not shown substantial prejudice. *Jenkins*, 38 M.J. at 289. This Court has held that delay preceding the CA's action depriving an individual consideration for parole does not establish that, but for the delay, he would have been granted parole. *United States v. Agosto*, 43 M.J. 853, 854 (N.M.Ct.Crim.App.1996).

Absent what this Court has called "verified or verifiable prejudice," relief is unavailable. *United States v. Schlarb*, 46 M.J. 708, 710 (N.M.Ct.Crim.App.1997)(quoting *Agosto*, 43 M.J. at 854).

■ While we do not condone the unexplained delay by the military judge in authenticating the record of trial, we find that the alleged prejudice is speculative at best. We reach this conclusion based upon the fact that even after the Charleston Brig Clemency and Parole Review Board made its recommendation for clemency, *the appellant was not paroled for another six months.* Furthermore, that Board specifically made its recommendation for a date in the future to allow the appellant to clear up his outstanding civilian court proceedings. Finally, based upon our own understanding of the parole proceedings,[5] given the nature of the appellant's offenses and the length of his sentence, we find no reasonable likelihood that, had the convening authority acted more quickly, the appellant would have been paroled any earlier. Accordingly, we decline to grant relief.[6]

### Conclusion

Accordingly, we affirm the findings and sentence as approved on review below.

Senior Judge LEO and Judge NAUGLE concur.

strictly military offenses and his sentence to confinement was for only 90 days. *Clevidence*, 14 M.J. at 17–19.

4. *Clevidence*, 14 M.J at 17, is the only case cited in this summary disposition.

5. The Parole Board considers numerous factors when deciding clemency and parole issues. Among the factors considered are: the nature and circumstances of the offense; the military and civilian background of the offender; the post-trial progress reports; recommendations by the military judge and/or the staff judge advocate; and the recommendation of disposition boards. SECNAVINST 5815.3H dated 5 October 1993 at ¶ 310.

6. Although we do not grant relief, we distance ourselves from the Government's suggestion that, since the military judge caused most of the delay,

the Government should not be held accountable for the delay. Government's Brief dated 30 Jun 2000 at 22. R.C.M. 1103 places the responsibility upon the trial counsel to cause the record of trial to be prepared. Thus, the trial counsel has a continuing obligation to move the post-trial processing along up to the point where he causes a copy of the authenticated record of trial to be served upon the accused. In those cases where the military judge is taking an inordinate amount of time in authenticating the record, the trial counsel should be routinely making inquiries of the military judge as to the status of the record. Furthermore, staff judge advocates should also be monitoring the authentication process so that in their recommendation they can explain any inordinate delays.